IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Barry Keith Runyans, #121063, ) | Civil Action No. 6:07-1600-HFF-WMC |
| ) | |
| Petitioner, ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| vs. ) | |
| ) | |
| Colie Rushton, Warden, ) | |
| ) | |
| Respondent. ) | |
| ) | |

The petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review posttrial petitions for relief and submit findings and recommendations to the District Court.

## BACKGROUND OF THE CASE

The record reveals that the petitioner is currently confined in the McCormick Correctional Institution of the South Carolina Department of Corrections (SCDC), pursuant to commitment orders from the Cherokee County Clerk of Court. The Cherokee County Grand Jury indicted the petitioner at the at the May 2002 term of court for grand larceny (02-GS-11-0260) and burglary in the first degree (02-GS-11-0261). Attorney Sheryl Bland represented him on these charges. On May 23, 2002, the petitioner received a jury trial before the Honorable Gary E. Clary. The jury found him guilty as charged. Judge Clary sentenced him to 10 years imprisonment for grand larceny of more than $1,000 and 30 years

imprisonment for burglary in the first degree, to run concurrently.  A previously entered probationary sentence was revoked in full.  The petitioner did not appeal his convictions and sentence.

The petitioner filed a *pro se* post-conviction relief (PCR) application (02-CP-11-609) on August 29, 2002, in which he alleged three grounds for relief:

(1)    Attorney should have filed an appeal

(2)    Ineffective Assistance of counsel

(3)    Due process violated

The State filed its return on July 30, 2003.  The petitioner thereafter submitted a lengthy amendment to his PCR application and supporting memorandum February 24, 2004.  He raised the following allegations in his amendment:

(1)    The amendment to Applicant's indictments divested the trial court of subject matter jurisdiction.

(2)    Ineffective assistance of trial counsel. Trial counsel was constitutionally ineffective and Applicant was prejudiced in the following particulars:

(a)    Through trial counsel's failure to timely file a Notice of Intent to Appeal; and failure to even discuss with Applicant the advantages and disadvantages of appealing.  But for the ineffectiveness of trial counsel a direct appeal would have been filed.

(3)    (a) Trial counsel was ineffective and Applicant was prejudiced and denied a fair trial through counsel's failure to argue to the jury that the only physical evidence in the case put co-defendant Timothy Joe Ramsey at the crime scene and not Applicant, thereby validating Applicant's statement to Detective Duncan that he was only on the scene after the fact.

(b)    Trial counsel was ineffective and Applicant was prejudiced and denied a fair trial through counsel's failure to move and argue for suppression of the statements [given by Petitioner].

2

(4)     Trial counsel was ineffective and Applicant was prejudiced and denied a fair trial through counsel's failure to object to the court's erroneous charge to the jury concerning "the hand of one is the hand of all" and through counsel's failure to request the court to give the proper charge based on the evidence and the issues developed in the trial of the case.

(a)     Trial counsel should have requested and the court should have instructed the jury as follows:

In order to convict any defendant of any crime, the evidence must prove that he either perpetrated the crime or affirmatively aided and abetted its commission. Prior knowledge that the crime is going to be committed or has been committed, without more, is not sufficient to make a person guilty of that crime. Mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish guilt unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator. You the jury may find the defendant, depending on your view of the evidence, guilty or not guilty on either indictment independent of each other.

The Honorable Roger L. Couch held an evidentiary hearing into the matter on December 13, 2005, at the Cherokee County Courthouse.  The petitioner was present at the hearing; and attorney Thomas A.M. Boggs represented him.  Assistant Attorney General Molly R. Crum represented the State.  The petitioner testified on his own behalf. The State presented the testimony of trial counsel, Ms. Bland, as well as former Assistant Seventh Circuit Solicitor Robert Bruce and Deputy Seventh Circuit Solicitor Donnie Willingham.  On April 25, 2005, Judge filed an order denying and dismissing the application with prejudice.  The order addressed the petitioner's claims that the indictments were improperly amended to reflect the names of the victims; and his claims that counsel was ineffective for not requesting a mere presence instruction and for not perfecting a direct appeal.  As to the latter, Judge Couch ordered that the petitioner was entitled to a new appeal of his convictions.[1]

--------

[1] *See Roe v. Flores-Ortega*, 528 U.S. 470 (2000) and *White v. State*, 263 S.C. 110, 208 S.E.2d 35 (1974).

3

A timely notice of appeal was served and filed. Assistant Appellate Defender Robert M. Pachak represented him in collateral appellate proceedings. On October 5, 2005, Mr. Pachak filed a petition for writ of certiorari on the petitioner's behalf. The only question presented in the petition for writ of certiorari was stated as follows:

> Whether there was any evidence to support the findings of the PCR judge that petitioner was entitled to a belated appeal?

On October 5, 2005, Mr. Pachak also filed an *Anders*[2] brief of appellant pursuant to *White v. State* on the petitioner's behalf and petitioned to be relieved as counsel. The only question presented in the petition for writ of certiorari was stated as follows:

> Whether the trial court erred ro suppress appellant's second statement when it was taken after he invoked his right to counsel?

The State submitted a letter in lieu of filing any responsive pleading on October 6, 2005. The petitioner thereafter filed "Petitioner['s] Reply Anders Brief," in which he raised two issues:

> (1)    Did the trial court lack subject matter jurisdiction to try, convict and sentence Petitioner. When in the indictment originally did not include all of these elements of the offense charged and the Solicitor amended the indictment on his own to include those elements. Thereby not informing Petitioner nor his attorney.

> (2)    Petitioner was denied his 6th, 14th, and 5th Amendments Rights as a result of the Prosecution misconduct.

The South Carolina Supreme Court filed an unpublished decision on January 22, 2007, in which it dismissed the appeal, *Runyans v. State*, 07-MO-005 (S.C. S.Ct., Jan. 22, 2007); and it sent the remittitur to the Cherokee County Clerk of Court on February 8, 2007.

The petitioner raises three allegations in his *pro se* petition now before this court:

---

[2]*See Anders v. California*, 386 U.S. 738 (1967).

4

**GROUND ONE:** The trial court erred in refusing to suppress Petitioner's second statement because it was taken after Petitioner had invoked his right to counsel, which deprived Petitioner of due process of law.

**SUPPORTING FACTS:** While under arrest and in jail on other charges, the police initiated contact with Petitioner about a burglary they suspected Petitioner being involved in. Petitioner had already given one statement, but the police sought a second more damaging statement. Petitioner asked to speak to an attorney, and Officer Duncan told the Petitioner he did not have an attorney at the time. Officer Duncan then took a second statement. (App. p. 78, lines 4-12). The trial court refused to suppress the second statement. (App. p. 88, lines 4-p. 90, lines 22). That ruling was error because it violated due process of law.

**GROUND TWO**: The amendment to the Petitioner's indictments divested the trial court of subject matter jurisdiction.

**SUPPORTING FACTS**: The indictments in this case originally listed the victims as Mark & Marie Propst. Initially, the court was unsure as to whether Mr. Propst's name was Mack or Mark, (App. p. 9, 1. 18). At the conclusion of the court's charge to the jury the court "cleaned up the indictments", (App. p. 431, 1. 22). On both indictments Mark is lined out and changed to Mack, and Propst is lined out and changed to Thompkins. The amendment was a material change which modified what Petitioner was called upon to answer because Petitioner did not have proper notice of the charges against him, thereby, divesting the trial court of subject matter jurisdiction.

**GROUND THREE**: Petitioner was denied due process of law because of the misconduct by the Solicitor in failing to disclose to the defense the terms of the agreement made between Petitioner's co-defendant and the Solicitor's office for the co-defendant's testimony against Petitioner, which violated the doctrines as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963).

**SUPPORTING FACTS**: Petitioner testified at the post-conviction relief hearing that his co-defendant, Timothy Joe Ramsey, had received a time cut for his testimony against Petitioner. Petitioner testified that recently, prior to the post conviction relief hearing, he learned through his aunt, who is Timothy Joe Ramsey's mother, that Timothy Joe Ramsey's fifteen years violent sentence was changed to a fifteen year non-violent sentence following the Petitioner's trial. Timothy Joe

5

Ramsey testified at trial that he was not offered any deal for his testimony. That testimony was perjury.

On October 4, 2007, the respondent filed a motion for summary judgment.  By order filed October 5, 2007, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion.  The petitioner filed his opposition to the motion on December 13, 2007.

## APPLICABLE LAW

Title 28, United States Code, Section 2254(d) and (e) provides in pertinent part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

6

**ANALYSIS**

*Ground One*

In ground one, the petitioner contends that the trial judge erroneously denied his trial counsel's motion to suppress his second statement because it was taken after he had invoked his right to counsel. The trial judge held a pretrial *Jackson v. Denno*, 378 U.S. 368 (1964) hearing. Only two witnesses testified at the hearing: Det. Darrell Duncan and the petitioner. Det. Duncan is employed by the Cherokee County Sheriff's Department. He investigated this case and had the arrest warrants issued for the petitioner's arrest. Det. Duncan spoke with the petitioner three times on September 7, 2001 (App. 44). Det. Duncan first spoke to the petitioner at the Cherokee County Detention Center because he had information from the victim that a neighbor had indicated that the petitioner "and several other people [were] involved in their burglary." The petitioner was not under arrest in connection with this case but was in jail on another, unrelated charge. Although the petitioner knew who Det. Duncan was, Det. Duncan introduced himself, explained why he was at the Detention Center, and told the petitioner that he had heard the petitioner, "Joe Dean and some other subjects were involved in" a burglary. During this conversation, the petitioner said that he had worked for narcotics officers from the State Grand Jury, as well as the Cherokee and Spartanburg County Sheriff's Departments. Also, Det. Duncan advised the petitioner of his *Miranda* rights from a pre-interrogation waiver from (State's Ex. 1). Det. Duncan checked off each right as he read it to the petitioner. At the conclusion of the warning, the petitioner stated that he understood his rights, and he signed the form under a sentence which reads "I have read the above rights and understand them fully" (App. 45-50, 72-73).

Once the advice of rights had been executed, Det. Duncan also read a waiver of rights form to the petitioner (State's Ex. 2), and he executed it and indicated he was willing to speak with Det. Duncan. Det. Duncan testified that he did not threaten the petitioner in

7

any way, and the petitioner indicated that he understood his rights.  Det. Duncan then spoke

to the petitioner about the burglary.  They began their discussion at 3:55 p.m. and, ultimately,

the petitioner gave a two page statement (State's Ex. 2; App. 50-52, 54).

Det. Duncan first discussed the case with the petitioner, then he wrote out the

petitioner's  statement and read it back to him.  The petitioner initialed at the beginning and

end of each paragraph.  He signed the top and bottom of each page, and he signed it at the

bottom of both pages (App. 52-53).  This statement reads as follows:

> Sometimes around a week or a week and a half ago I was at
> home with Kelly Hollifield watching TV. Sometime right around
> ten p.m. Joe Ramsey pulled up in my driveway in a small gray
> truck. The truck belongs to Joe Ramsey's mother. Joe came in
> and he stated that he wanted me to see what he had on the
> truck. It was cold outside, but I walked outside with Joe. Tina
> Wray, Joe's girlfriend, was sitting in the driver's seat. Joe had a
> big TV that took up the whole truck, a VCR, satellite box, and a
> white illegal satellite box. They could have had more on the
> truck. I don't remember seeing anything else. I asked Joe where
> he got it from and he stated that they got it off of one of those
> credit cards in other people's names. Joe had asked me if I
> wanted to buy the stuff or if I knew anyone that wanted to buy it.
> They stayed at the house for about two hours trying to get me to
> drive them to a crack house to trade for crack. While Tina called
> someone on the cell phone and stated that she had someone to
> take it for crack, they talked me into driving them to a crack
> house in Kings Mountain. We went 85 north to Dixon School
> Road, turned left back across 85 back towards 29. About a mile
> to two miles we took a left traveling down to the end of the road
> and took a right onto a dirt road. We went to a trailer all the way
> to the far right at the end. Joe and Tina get out to talk to the
> black guys. I asked who lived there and they stated Buster, the
> one that had killed the girl in Blacksburg. I saw Buster at the
> trailer. Buster, Joe, and another big black guy unloaded the
> truck. When we left I asked Joe how much he got for it. Joe
> showed me about ten small crack rocks, about $200.00 worth.
> I told Joe that the stuff was worth about five thousand. The stuff
> looked new. Three days later I heard about a house getting
> broken into and a big screen TV was stolen. I then knew where
> the big screen TV came from.

(App. 53-54).

Det. Duncan thereafter attempted to speak with all of the people the petitioner had mentioned in his statement to corroborate or refute the statement. The results of his further investigation led to doubts as to the truthfulness of the petitioner's statement, so he went back and spoke to the petitioner on November 12, 2001, at the Cherokee County Detention Center. The petitioner still had not been charged in connection with this case. Using another pre-interrogation form (State's Ex. 3), Det. Duncan again advised the petitioner of his *Miranda* rights in the same fashion as he had done with the earlier statement. The petitioner indicated to Det. Duncan he understood his rights (App. 55-58).

Det. Duncan also read another waiver of rights form to the petitioner, who executed it in the same fashion as he had done with the first statement. Again, no promises or threats were made to induce the waiver of rights. When Det. Duncan told the petitioner that he had given a different account from his statement, the petitioner "made the statement that he was wanting to tell me the truth this time." Det. Duncan then took a four-page written statement from the petitioner in the same manner as he had with the earlier statement. The petitioner initialed each paragraph. Also, he signed the top and bottom of each page and signed at the end of the statement. The petitioner gave the statement voluntarily and was not promised anything (App. 58-59, 63-65). His November 12th statement reads as follows:

> About two weeks ago me and Kelly went to Diane's house. Joe told me to tell Diane that I had someone to fix the door on her truck to see if we could use it. Me, Joe, Kelly and Tina left in the truck. I left driving but switched just down the road. Me and Joe sat on the back. Kelly drove and Tina sat up front. We drove up to Lookout Tower Road. Joe had pointed out a house and made the statement that he would like to break in that house. Joe stated that boy named Chris lived there and had lots of guns. Joe stated that someone was always home. Kelly had made the statement of a truck driver who lived on Lookout Tower Road that had an illegal card. Kelly stopped just down the road from the trailer, because the truck wasn't at home. Joe got off the truck and ran to the trailer. Minutes later he came back and stated let's go. Joe stated that he knocked on the front door. And when no one answered, he kicked the door open. Joe said

he ran through the house and opened the back sliding door. Joe stated that there was a big screen TV in the house and that he would slide it to the rear door. Kelly drove the truck to the back of the trailer and backed in towards the rear steps. When Kelly backed up, she almost got the truck stuck. Me and Joe pushed the truck out of the hole. Joe ran back in the house and rolled out a big screen TV to the sliding door. I picked one side up and he got the other side. We started down the steps and Joe dropped his side. When we got to the bottom of the steps, I got back in the truck and said let's leave it because it was heavy. Kelly and Tina jumped out of the truck and stated no, there would be fingerprints. We all got out and got the TV on the truck. Joe also had a white illegal box, VCR, satellite system, two CB's, and Kelly got a heater out of the back storage room. We all got on the truck and left and went to Diane's house. We didn't stay long because if Diane saw the stuff, she would tell, so we went to my house. After getting to my house, we were trying to get someone to buy the stuff. Tina got in touch with Buster, who stated he would take the TV. Me and Joe took the TV and the illegal box to Buster's. I told Joe that the TV was at least worth $500.00 because it was new. Joe told me that we needed to get rid of it. Joe stated we probably scratched it up real bad. Joe told some big black dude that he wanted crack. I wanted a $100.00. I didn't do crack and the black guy named Marcus got up and went to the back bedroom. When Marcus returned, he stated that Buster stated $40.00 and some crack. Joe gave me $40.00 and we left. Buster or Marcus didn't want the white box. The next day me, Kelly and Gina Ramsey loaded up in my car because Kelly wanted to get rid of the heater. We went to a house behind the General Dollar Store in Blacksburg and got rid of the heater. Kelly sold the heater for $50.00 to some guy. Earlier in the day we got rid of the VCR and the illegal white box to Doug Allison on Cherokee Avenue. We got a 150 for the stuff. Day or two later me and Kelly used Diane's truck to get an antenna from Kelly's mom's house. When we got to Kelly's mom, there was a lawn mower sitting out near the road. Kelly made the statement she could drive the lawn mower straight up on the truck. It was just getting dark and her mother wasn't home. I think there had been a death in the family or something. I walked next door to talk to Adam, the boy next door to her momma. When I returned, Kelly had the truck pulled on the grass backed up to the gully. Kelly went and got the lawn mower and started it up. The lawn mower kept cutting off, but she got it over to the truck. I was going to move the truck but Kelly had taken the key. Somehow Kelly had got the lawn mower on the truck. We left and went to Diane's and unloaded the lawn mower. Joe helped me unload the lawn mower and later he sold

10

> it to Diane. Joe got $200.00 and was going to give me a
> hundred but Kelly took the money. They next day me and Joe
> loaded the lawn mower up and took it to my house. I fixed the
> lawn mower and Kelly gave the lawn mower to the landlord. The
> landlord knocked off the rent to the trailer. Kelly got $200.00.

(App. 60-63).

On December 3, 2001, Det. Duncan visited the petitioner at the Detention Center and asked whether he wished to make any changes or additions to his statements. After going through a waiver form and reviewing it, the petitioner initialed a statement that "my statement is true and remains true" on the waiver form. Again, Det. Duncan advised him of his rights before he did so. This was after he was charged in connection with the present case (App. 64-65).

The petitioner testified that on the first occasion when he met with Det. Duncan in the Detention Center, Det. Duncan said that he wanted to talk to the petitioner about a burglary. Det. Duncan also told him that he "used to be in narcotics" and was aware that the petitioner was "doing some work for the narcotic(s) team." Det. Duncan thereafter told him " if you have any involvement in [the burglary], . . . I'll charge you with receiving stolen goods." In the subsequent November 12th interview, Det. Duncan had a tape recorder and told the petitioner that he was recording the statements. The petitioner admitted that he signed State's Ex. 1 (the pre-interrogation form) on the same day of the interview. He also admitted that his rights were read to him and he gave a statement at the time (App. 75-77).

With respect to the November 12th statement, however, the petitioner claimed that Det. Duncan "got a verbal statement from me and came back the next day." Det. Duncan allegedly had "the papers stacked up . . ., where all I had to do [was] go down and sign my name, and he said he would charge me with receiving stolen goods." Det. Duncan also said he would "charge the girls with stolen goods and Joe Ramsey with burglary." The

11

petitioner and Det. Duncan were alone when this promise was supposedly made. He testified that when he attempted to invoke his right to counsel, and Det. Duncan told him that he did not have an attorney. Also, the petitioner signed the second pre-interrogation form on the day that Det. Duncan came to talk with him. He explained that he agreed to speak with Det. Duncan because he was working for the State Grand Jury and narcotics officers from both Spartanburg and Cherokee Counties. Det. Duncan, therefore, knew him "pretty well," although they supposedly had "some falling out... in the past." He told Duncan the same story he had told other officers that the incident involving the television set was related to his work in narcotics (App. 77-81). On cross-examination, he admitted that he had signed all of the documents at issue, but he maintained that Det. Duncan told him that he had to do so. He also claimed that the four-page statement dated November 12th was blank when he signed it. Therefore, he read the first statement and did not read the second one (App. 82-86).

The trial judge reviewed the exhibits, and found by preponderance of the evidence that before the petitioner gave either of the statements he was fully advised of each of his *Miranda* rights and his rights under the Fifth and Sixth Amendments to the United States Constitution, including both his right to remain silent. He found the petitioner intelligently waived his rights under the Fifth and Sixth Amendments, as well as his *Miranda* rights, and that his statements were freely and voluntarily given, without: (1) duress, (2) coercion, (3) hope of reward, (4) promise of leniency, (5) threat of injury, and (6) compulsion or indictment of any kind. Further, the trial judge found that the "statements were the voluntarily product of the free and unconstrained will of this [the petitioner]." He therefore found that both statements were admissible. The admissibility of the November 12, 2001, statement was the only issue raised in the *Anders* brief of appellant pursuant to *White v. State*. The South Carolina Supreme Court denied certiorari without comment.

12

In order to protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda* adopted prophylactic procedural rules that must be followed during custodial interrogations. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A suspect in custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. Generally, any statements elicited from a suspect in violation of these rules are inadmissible in the prosecution's case-in-chief. *See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam). The procedural safeguards prescribed by *Miranda* only apply "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). A person is "in custody," for *Miranda* purposes, if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. *See Stansbury*, 511 U.S. at 322.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*. at 484-85. "*Edwards* sets forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel." *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (quoting *Solem v. Stumes*, 465 U.S. 638, 646 (1984)) (emphasis in *Smith*). Finally, the Court has held that a defendant must invoke his right to counsel "unambiguously." *See Davis v. United States*, 512 U.S. 452, 459 (1994).

The petitioner contends that the trial court erred in refusing to suppress his second statement because it was taken after he had invoked his right to counsel. This is predicated upon his testimony at the *Jackson v. Denno* hearing. However, his testimony was inconsistent with the testimony of Det. Duncan, who stated that the petitioner voluntarily

13

waived all of his rights before giving the second statement on November 12th. This testimony created an obvious factual dispute for the trial judge to resolve, and he resolved it against the petitioner and in favor of the admissibility of his second statement. The respondent argues that this court should give deference to the trial judge's factual findings.  This court agrees.  *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) (only the trial court can observe "the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said," which is important to the determination of whether a witness is to be believed).  As argued by the respondent, those findings are not objectively unreasonable under Section 2254(d)(2); and the petitioner has not met his burden of rebutting the presumptive correctness of his finding by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).


***Ground Two***

         In this ground, the petitioner claims that the amendment of the indictments to reflect the correct name of the victims deprived the trial court of subject matter jurisdiction because he did not have proper notice of the charges against him.

         Here, there were two facially valid indictments charging the petitioner with two offenses – grand larceny (02-GS-11-0260) and burglary in the first degree (02-GS-11-0261) (App. 577-79).  *See* S.C. Code Ann. § 16-11-311(Supp. 2007) (burglary in the first degree) and S.C. Code Ann. § 16-13-30 (Supp.2007) ( "Larceny of goods, chattels, instruments, or other personalty valued in excess of one thousand dollars is grand larceny").  The PCR judge found that "from the record of the trial, it is clear that the correct names of the true victims were known from the beginning of the trial . . . [and] the defense was aware of their true identity" (App. 572-73).  The PCR judge found that the trial judge had amended the indictments so that they appeared as they currently do, listing the victims as "Mack and Marie Thompkins."  Although the male victim's name should be "Mack Probst," the PCR

14

judge found that Ms. Thompkins' name was correctly listed. He further found that the indictments were facially valid since they apprised the petitioner of the elements of the offense, Ms. Thompkins' identity was correctly listed, and he had notice of the victims' true identities (App. 573).

The respondents argue that this issue is not properly before this court in a habeas setting since it is purely a state law matter. This court agrees. A state court's determination that one of its courts had jurisdiction over a purely state law criminal charge is not a matter which is cognizable in federal habeas corpus absent a showing of a "complete miscarriage of justice." *Wright v. Angelone,* 151 F.3d 151, 158 (4th Cir. 1998). Claims involving the application and interpretation of a state statute and state court rules are not cognizable in federal habeas actions. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (holding "[i]t is not the province of a federal habeas corpus court to reexamine state-court determinations on state-law questions."). Habeas corpus relief is available to a state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "'[F]ederal habeas corpus relief does not lie for errors of state law.'" *Estelle,* 502 U.S. at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Based upon the foregoing, this allegation should be dismissed.

### *Ground Three*

In this ground, the petitioner claims he was denied due process of law because of the misconduct by the Solicitor in failing to disclose to the defense the terms of the agreement made between his co-defendant, Timothy Joe Ramsey, and the Solicitor's office for the co-defendant's testimony against him, which violated the doctrines as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963). This issue was not ruled upon by the PCR judge. The failure to pursue that claim and seek a ruling on it barred review on appeal. *See Plyler v. State*, 424 S.E.2d 477, 478 (S.C. 1992) (issue that is neither raised at PCR hearing nor

15

ruled upon by the PCR court is procedurally barred from appellate review) (citing *Hyman v. State*, 299 S.E.2d 330 (S.C. 1983)).  If a petitioner before a federal district court fails to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in state courts.  In such a case, a federal district court is barred from considering the habeas claim absent a showing of cause and actual prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice, as the exhaustion requirement is technically met and the rules of procedural bar apply.  *Matthews v. Evatt*, 105 F.3d 907, 916 (4th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

A prisoner may establish a fundamental miscarriage of justice by showing that a constitutional error probably resulted in the conviction of one who is actually innocent.  In order to raise a claim of actual innocence, a prisoner "must present evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error."  *Schlup v. Delo*, 513 U.S. 298, 316 (1995).  The petitioner has made no such showing in this case.

The petitioner also has not shown cause and actual prejudice as this allegation lacks merit.  To prove a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), a defendant must show the undisclosed evidence  was (1) favorable; (2) material; and (3) that the prosecution had it and failed to disclose it.  *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001).  Evidence is "favorable" not only when it would tend to exculpate the accused, but also when it can be used to impeach Government witnesses.  *See United States v. Bagley*, 473 U.S. 667, 676 (1985).  Evidence tending to impeach a Government witness must be disclosed to a defendant if known to the Government. *Giglio v. United States*, 405 U.S. 150, 153-55 (1972).  Evidence is material if there is a reasonable probability its disclosure would have produced a different outcome. *See Bagley*, 473 U.S. at 682.  A

16

"reasonable probability" of a different result is shown when the Government's failure to disclose evidence "undermines confidence in the outcome of the trial." *Id.* at 678.

The petitioner's co-defendant, Timothy Joe Ramsey, testified for the prosecution (App. 236-74). At the beginning of his testimony, the State elicited that he was in SCDC a the result of "a burglary on Lookout Tower Road over in Blacksburg," and that he had pled guilty to burglary in the second degree and grand larceny stemming from that incident. He also denied that anyone had promised him anything in exchange for testifying against the petitioner (App. 236).

The petitioner testified at the PCR hearing that Ramsey had pled guilty in December 2001 to burglary in the second degree, as a violent offense, and received a 15-year sentence. He claimed that Ramsey's classification in SCDC had changed and his sentence was being treated as non-violent and, instead of having to serve 85% of his sentence as originally ordered, he was parole eligible in 2007 (App. 501-04).

Former Assistant Solicitor Robert Bruce testified at the PCR hearing that he prosecuted the charges against the petitioner. He further testified that he did not offer Ramsey anything in return for his testimony (App. 544). Then-Deputy Solicitor Donnie Willingham testified that he handled the Ramsey guilty plea, which was also before Judge Clary. Through Willingham, the State introduced State's Ex. 1: two December 17, 2001, sentencing sheets and a commitment form for Ramsey, which were signed by Judge Clary. One sentencing sheet reflected a charge of second degree burglary, "violent," while the other sheet was for grand larceny, between $1,000.00 and $5,000.00. The State also introduced a copy of Ramsey's guilty plea transcript as State's Ex. 2 (App. 560-62). Willingham testified that he never promised Ramsey that his plea was contingent upon testifying against the petitioner or even mentioned testifying against the petitioner at the time of Ramsey's guilty plea. Also, Ramsey's plea occurred before the petitioner's trial. Further, Willingham took no action with respect to Ramsey's plea after the petitioner's trial (App. 562-63).

State's Ex. 2 from the petitioner's PCR hearing, a transcript of Ramsey's December 17, 2001, guilty plea before Judge Clary, reflects he pled guilty to second degree burglary and grand larceny. Further, it was explained to him that the burglary charge was a "violent crime" under South Carolina law, *see* S.C. Code Ann. §§ 16-1-60, 16-11-312 & 24-21-640 (Supp. 2007); and he indicated that he understood the consequences of a "violent crime." He also understood that a prior probationary sentence could be revoked as a result of his plea (State's Ex. 2, pp. 3-8). More importantly, he admitted that he committed the offenses with which he was charged; he indicated that no one had promised him anything or "held out any hope of reward" to induce his guilty plea, other than the negotiation of the first degree burglary charge to a second degree burglary; that no one had threatened him or used pressure force or intimidation to induce the plea; and that he was pleading guilty freely and voluntarily (State's Ex. 2, p. 10).

Both the prosecutor who tried the petitioner's case and the prosecutor who tried Ramsey's case deny any deal was struck in exchange for Ramsey's testimony against the petitioner. Ramsey's guilty plea is also inconsistent with the petitioner's allegation. Moreover, the current records from SCDC reflect that the sentence Ramsey is serving for burglary in the second degree is properly being treated as a sentence for a violent crime (resp. m.s.j., ex. 11). Based upon the foregoing, the petitioner's allegation lacks merit.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the respondent's motion for summary judgment be granted.

s/William M. Catoe
United States Magistrate Judge

March 21, 2008
Greenville, South Carolina

18